PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 04-3215

UNITED STATES OF AMERICA

v.

CARL D. MCBANE,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No.: 03-cr-00228
District Judge: The Honorable Donetta W. Ambrose

_____

Argued October 21, 2005

Before: SMITH, BECKER, and NYGAARD, *Circuit Judges*

(Filed: December 30, 2005)

_____

Counsel:        Sally A. Frick (Argued)

1601 Frick Building
Pittsburgh, PA 15219
*Counsel for Appellant*

Michael L. Ivory (Argued)
Bonnie R. Schlueter
Laura S. Irwin
Paul M. Thompson
Office of United States Attorney
700 Grant St.
Suite 400
Pittsburgh, PA 15219
*Counsel for Appellee*

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

Appellant Carl McBane challenges jury verdicts convicting him of one count of selling a stolen firearm in violation of 18 U.S.C. § 922(j) and one count of making a materially false statement to a federal agency in violation of 18 U.S.C. § 1001. McBane also seeks resentencing in light of the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005). For the reasons set out below, we will uphold the jury verdicts on both the firearm and false statement charges, and we will remand the case to the District Court for

resentencing.

## I.

Carl McBane was employed as a full-time police officer, with the rank of sergeant, for the borough of McKees Rocks in Allegheny County, Pennsylvania at all times relevant to the events described herein. On July 11, 1999, three members of the McKees Rocks Police Department arrested Mark Suchoza. Suchoza was booked and his personal belongings confiscated. Among those belongings was a Henry Model Survival .22 caliber rifle. Though Suchoza was not charged with any crime in connection with owning or possessing the rifle, it was not returned to him when he was released from custody after paying a fine for public intoxication.[1] At the time, McBane was one of two weapons specialists in the department who dealt with firearms brought into the station as evidence or as confiscated personal items.

Gerald Smith was a local constable for McKees Rocks and adjacent municipalities. He was also an informant for the Federal Bureau of Investigation ("FBI") who was cooperating in investigations into public corruption in the municipalities in

---

[1]Several weeks after his first arrest, Suchoza was arrested again for public intoxication, booked, fined and released. He neither asked for nor was given his rifle upon his second release from custody.

3

which he worked. Smith testified that he was "good friends" with McBane, and that the two both worked security at bingo events held at a local booster club. One night during the summer of 2001, while the two were working together, McBane showed Smith Suchoza's rifle. Smith testified that when asked by Smith where he got it, McBane referred to Suchoza, then "[h]e said, well, this [rifle] was his. He said, we didn't give it back. I said, what are you going to do with it. He said, I am going to sell it." McBane then sold the rifle to Smith for $80. Smith notified the FBI that he had purchased the rifle from McBane, and the FBI initiated an investigation.

At the time Smith informed the FBI about the rifle, federal agents had already received information from a dispatcher at the McKees Rocks Police Department that McBane had sold the rifle. The FBI received the information from both sources in June of 2002. Thereafter, McBane attempted to cover-up his removal and sale of the rifle and another gun, a .22 caliber handgun.[2] He told Smith that the FBI was asking questions about the guns and that he needed to get them back and return them to his office at the department.

---

[2]The second gun was the subject of Count Two of the indictment (*see infra*, this section). The second gun was turned over to McBane by the former owner. McBane sold the handgun to Smith for $50 approximately one month after he had sold Smith the rifle. The jury acquitted McBane of the knowing theft and sale of the second gun, but the false denial at issue in this appeal relates to both guns.

Smith agreed to give the guns back to McBane, but first, and without McBane's knowledge, Smith gave them to FBI Special Agents who photographed them as part of the investigation. The agents then arranged to electronically surveil Smith returning the guns to McBane. In the meantime, McBane reimbursed Smith for the price of the guns.

On August 26, 2002, Smith met McBane and returned the guns to him while wearing a recording device and under surveillance by the FBI. During that encounter, McBane made the comment to Smith that he could now let the FBI come into his office and see the guns.

On September 9, 2002, the same two FBI Special Agents who had been dealing with Smith went to McBane's house and asked him a series of questions focused on the guns McBane had sold to Smith. McBane told the Agents that the guns had never been sold and had remained in the physical custody of the department. McBane further stated that the guns were stored in his office and that he could show them to the Agents. Later that day, McBane showed the Agents the guns in his office at the department. That evening, in another recorded conversation with Smith, McBane told Smith that he had spoken to the Agents and "told them that [the guns] had never left . . . his office." McBane eventually admitted selling both guns to Smith and orchestrating the return of the guns to the office. He also admitted to lying to the Agents about the sale of the guns.

McBane claims that he first became aware of the rifle in

5

late summer 1999 and that, weeks later, he removed it from the "filing cabinet" on which it was sitting and put it in his office. He also contends that he asked several individuals about the rifle's origins but got no knowledgeable response and that, sometime later, he ran a computer check on the rifle to determine if it had been stolen and found that the rifle was not in the system. McBane kept the rifle in his office for two years and removed it in the summer of 2001 in order to sell it to Smith.

McBane was charged in a three-count indictment returned on September 10, 2003. Counts One and Two charged McBane with selling stolen firearms in violation of 18 U.S.C. §§ 922(j)[3] and 924(a)(2),[4] and Count Three charged him with

---

[3]18 U.S.C. § 922(j) provides in relevant part:

> It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm . . . which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm . . . was stolen.

[4]Section 924(a)(2) is the penalties provision for § 922(j). It provides in relevant part that "[w]hoever knowingly violates subsection . . . (j) . . . of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."

6

making a materially false statement in violation of 18 U.S.C. § 1001(a)(2).[5]  A superseding indictment was filed on March 24, 2004.  McBane pled not guilty, and a jury trial ensued which lasted from April 12 to April 16, 2004.[6]  A jury convicted McBane on Count One for selling the rifle to Smith and on Count Three for making the materially false statements to the FBI.  He was acquitted of selling the handgun.

The District Court denied McBane's post-verdict motion for judgment of acquittal on April 27, 2004.  On July 30, 2004, under the pre-*Booker*, mandatory regime of the United States Sentencing Guidelines (hereinafter "Guidelines"), McBane was sentenced to 21 months for each count, to run concurrently, followed by two years of supervised release.  McBane's offense level under the Guidelines included enhancements for his role

---

[5]18 U.S.C. § 1001(a)(2) provides in relevant part:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, imprisoned not more than 5 years . . . or both.

[6]The District Court had original jurisdiction over McBane's criminal trial under 18 U.S.C. § 3231.  We exercise appellate jurisdiction under 28 U.S.C. § 1291.

in the offense and for the fact that the rifle was stolen.[7]  McBane filed a timely appeal challenging the judgments of conviction and his sentence.

## II.

As to his convictions, McBane challenges the jury's verdicts as "not supported by the evidence."  Thus, his appeal requires us to decide two issues: (1) whether the jury's verdict that McBane knowingly sold a stolen rifle is supported by substantial evidence, and (2) whether the jury's verdict that McBane's false statements to FBI Special Agents were "material" under § 1001 is supported by substantial evidence. Where a petitioner "challenges the sufficiency of the evidence against him" as to particular charges and "believes that the District Court erred as a matter of law in allowing the[] verdicts to stand," we "must sustain the verdict[s] if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision."  *United States v. Beckett*, 208 F.3d 140, 151 (3d Cir. 2000).  We do not "weigh evidence or

---

[7]As is commonly known by now, the *Booker* decision severed and excised two sections of the Federal Sentencing Act, the effect of which was to render the Guidelines advisory rather than mandatory.  As we discuss below, our disposition of McBane's resentencing request is determined by the facts that (1) McBane was sentenced before the *Booker* decision, and (2) he received a sentence enhancement from the District Court under the mandatory regime.

determine the credibility of witnesses in making this determination." *Id.* Furthermore, we "must credit all available inferences in favor of the government" in making our determination. *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998).

A.

We first address the jury's finding that McBane knowingly sold a stolen rifle to Gerald Smith in violation of § 922(j). Most of McBane's argument on this point fails to attack the sufficiency of the Government's evidence as such. Instead, McBane merely rehashes trial evidence which he views as favorable to him. Specifically, McBane cites evidence he presented at trial indicating that: (1) the rifle was legitimately seized originally; (2) its owner did not request its return; (3) there are no written procedures in McBane's department for disposal of seized property that is not evidence; (4) McBane subjectively knew neither when his ownership of the rifle "occurred" nor the law of abandoned property. Based on these aspects of his case at trial, McBane asserts that the Government presented insufficient evidence that the rifle was stolen or that McBane knew or should have known it was stolen.

The evidence McBane presents, however, does little to undermine the Government's case. The assertions that the rifle was properly confiscated originally and that Suchoza never asked for its return do not help McBane. McBane was not involved in the rifle's lawful confiscation, and, at all events, the

issue is whether the rifle was unlawfully kept from Suchoza – or taken from the police department – *after* it was lawfully confiscated. McBane never sought to return the rifle to Suchoza. He sold the rifle for profit without Suchoza's knowledge or consent, without registering the gun in his own name, and without obtaining the consent of the police department to sell it.[8]

Similarly, McBane's defense that he lacked subjective knowledge that the rifle was stolen fails even to address the language in 18 U.S.C. § 922(j) indicating that McBane is liable

---

[8]We note that, even if we were to concede that Suchoza had legally abandoned his rifle by the time McBane sold it, such a concession would not help McBane under the law of theft in Pennsylvania. Irrespective of Suchoza's abandonment, the police department had a possessory interest in the rifle superior to McBane's. Under Pennsylvania law, theft of movable property is defined as an unlawful taking of "movable property of another." 18 Pa. C.S. § 3921. "[P]roperty of another" "[i]ncludes property in which any person other than the actor has an interest which the actor is not privileged to infringe . . . ." 18 Pa. C.S. § 3901. Thus, even if Suchoza did abandon the rifle, McBane stole the rifle because he deprived *the police department* of a superior possessory interest. Analogously, taking property from a bailee is deemed sufficient evidence of theft even though the bailee is not the actual owner. *See Commonwealth. v. Harrison*, 432 A.2d 1083, 1087 (Pa. Super. 1981).

if he "ha[d] reasonable cause to believe" the rifle was stolen.[9] His assertion that he did not subjectively know it was stolen begs the question of whether he should have known.

For its part, the Government presented extensive evidence at trial to support the § 922(j) charge. As to the theft of the rifle, the Government offered, *inter alia*, McBane's own words (from Gerald Smith's testimony at trial):

---

[9]We have not addressed the meaning of "reasonable cause to believe" in the context of § 922(j) or a similar statute. Only the Eighth Circuit has discussed the language meaningfully. *See United States v. Iron Eyes*, 367 F.3d 781, 785 (8th Cir. 2004). In *Iron Eyes*, the Court indicated that the above phrase may be read one of two ways:

> It may be read as requiring proof only that the defendant [sold] a gun that the so-called "reasonable person" would have believed was stolen in the circumstances of the case. But the better reading, we believe, requires proof that a defendant [sold] a gun that it would have been reasonable for him or her, in particular, to believe was stolen.

*Id.* (internal citations omitted). Because this case requires us to evaluate the evidence in the record in the light most favorable to the Government, we conclude that McBane would lose under either reading of the statute.

11

Smith: [W]here did you [get the rifle]?

McBane: [Y]ou remember [Suchoza]?

Smith: [Y]eah.

McBane: [W]ell, this was his. . . . [W]e didn't give it back.

Smith: [W]hat are you going to do with it?

McBane: I am going to sell it.

Based on this exchange, a jury could reasonably infer that the rifle did not rightfully belong to McBane, that McBane knew as much, and that he intended to sell the rifle anyway. The record clearly establishes that McBane sold the rifle. As we have indicated, our standard of review precludes us from assessing the credibility of Smith's testimony. The above evidence alone, taken in the light most favorable to the Government, might well be enough to sustain the jury's verdict as to McBane's knowing sale of a stolen rifle.

The trial record, however, provides additional evidence that supports the jury's verdict. The McKees Rocks Public

Safety Director[10] testified that McBane did not take the only lawful step he could have taken to register the gun in his name – to make it his property – namely, getting a court order to that effect. The Director further testified that McBane knew he should have taken that step. The Government also produced evidence indicating that McBane had received training in the lawful transfer of firearms and in the proper confiscation and logging of evidence. McBane himself testified that he was familiar with the policies operative in the department for dealing with confiscated property. Finally, the Director testified that, in spite of his knowledge of proper procedure, McBane proceeded to sell Suchoza's rifle to Smith without the consent of the Director or Suchoza himself, indeed without *attempting* to get the consent of either.[11] All of the above evidence is probative of the finding that McBane knowingly stole the rifle and sold it.

---

[10]The Public Safety Director is the chief of the McKees Rocks Police Department. He is hereinafter referred to as the "Director."

[11]It is worth noting that, despite the above concessions, the Director testified that he did not personally believe that McBane had stolen the rifle. The Director indicated that he viewed McBane's conduct regarding the rifle, essentially, as an administrative error. He testified further that, had McBane sought consent to sell the rifle, it would have been granted. Nonetheless, the jury disagreed with the Director on this point and properly concluded that McBane's conduct did indeed constitute theft.

Applying the relevant language from § 922(j), and evaluating the evidence in the light most favorable to the Government, Smith's testimony – combined with the testimony of the Director and the admissions and testimony of McBane himself – quite reasonably could be construed as proof that McBane sold a stolen rifle that he knew or should have known was stolen. We hold that substantial evidence supports the jury's verdict that McBane sold a stolen rifle to Gerald Smith in violation of 18 U.S.C. § 922(j).

### B.

We now turn to the jury's finding that McBane's false statements to the FBI Special Agents were material. The Supreme Court articulated the definition of "materiality" under 18 U.S.C. § 1001 in *United States v. Gaudin*, 515 U.S. 506, 512 (1995): To be "material," "[t]he statement must have a natural tendency to influence, or [be] capable of influencing, the decisionmaking body to which it is addressed." We acknowledged and applied that precise language in *United States v. McLaughlin*, 386 F.3d 547, 553 (3d Cir. 2004).[12] Thus,

---

[12]In *McLaughlin,* we dealt with the materiality provision not of § 1001, but of 29 U.S.C. § 439(b) (false statements of material fact or failure to disclose a material fact in the context of reporting requirements for labor organizations). *McLaughlin*, 386 F.3d at 551. That said, analysis of the two materiality

the language of the standard for materiality is well settled. It is also clear that a statement may be material even if no agency actually relied on the statement in making a decision. *See*, *e.g.*, *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995). Equally clear is that a statement is material if it is capable of influencing a particular decision of the agency in question. *See McLaughlin*, 386 F.3d at 553-54. The dispositive question on this issue is whether the test for "materiality" necessarily requires that a false statement be capable of influencing an *actual*, *particular* decision of the agency at issue, or whether the test requires only that a statement be of a type that would naturally tend to influence a *reasonable* decisionmaking agency in the abstract.

McBane argues that because the FBI's investigation was essentially complete when the Agents spoke to McBane about the guns, his false statements added nothing. As such, the statements were not "material" because they were not capable of influencing the particular decisions or actions taken by the FBI Agents in this case. The Government concedes that McBane's false statements did not influence and were not capable of influencing the decisions or actions of the particular Agents to whom McBane made those statements. The Government counters, however, that McBane's false statements

---

provisions is identical, and we treated the two as interchangeable. *See id.* at 554 (quoting the Sixth Circuit's interpretation of § 1001 to reinforce our interpretation of § 439(b)).

were still material because they were of a type that would naturally tend to influence a reasonable decisionmaker.

Though we acknowledge that a false statement that actually affects or is capable of affecting a *specific* decision by an agency makes for an easier materiality determination, we agree with the Government that both the language of the materiality standard and the decisions applying that standard require only that the false statement at issue be of a type capable of influencing a *reasonable* decisionmaker. The language of the materiality standard indicates that a statement is material if it has "*a natural tendency to influence*, or is capable of influencing, the decisionmaking body to which it is addressed." *Gaudin*, 515 U.S. at 512 (emphasis added). In our view, the phrase "natural tendency" connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself.

Supreme Court precedent supports this interpretation of the materiality language. *United States v. Kungys*, 485 U.S. 759 (1988), provides the clearest interpretation of the standard for materiality at the Supreme Court level. Specifically interpreting the phrase "natural tendency to influence," Justice Scalia's opinion for the Court stated that, rather than letting the "infinite variety of factual patterns that may emerge" around a statement drive the materiality question, the "safer" method is "to fix as our guide the central object of the inquiry: whether the misrepresentation or concealment was *predictably* capable of affecting, i.e., had a natural tendency to affect, the official

16

decision." *Id.* at 771 (emphasis added).  In other words, the Court judged the relevant inquiry to be whether the falsehood was of a type that one would normally predict would influence the given decisionmaking body.

*Brogan v. United States*, 522 U.S. 398 (1988), provides further support for the view that materiality does not turn on whether the FBI believed McBane's statements or whether they influenced the investigation.  Interpreting an earlier version of 18 U.S.C. § 1001, the Supreme Court stated:

> It could be argued, perhaps, that a *disbelieved* falsehood does not pervert an investigation. But making the existence of this crime turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly strange; such a defense to the analogous crime of perjury is certainly unheard of.

*Id.* at 402 (emphasis in original).  The Court continued that the possibility of "perversion of function . . . exists *whenever* investigators are told a falsehood relevant to their task."  *Id.* at 402 (emphasis added).

Additionally, our own decisions have affirmed the Government's position on materiality, albeit not in the § 1001 context.  In *In re Cohn*, we cited *Kungys* for the proposition,

17

regarding "materially false" disclosures in the bankruptcy context, that "a statement can still be material if it is so substantial that a *reasonable person would have relied upon it*, even if the creditor did not *in fact* rely upon it in the case at hand." *In re Cohn*, 54 F.3d at 1114 (first emphasis added). Similarly, in *McLaughlin*, after citing *In re Cohn* for the proposition that actual reliance on the statement is unnecessary to establish materiality, we stated that "the relevant inquiry is whether the false information is *of the type* that is capable of influencing a decision by an agency . . . ." *McLaughlin*, 386 F.3d at 554 (emphasis added) (internal quotation marks omitted).

Other courts of appeals that have had occasion to interpret the materiality standard have reached the same conclusion. Most clearly, the Ninth Circuit, citing and discussing the above language from *Kungys* in *United States v. Service Deli, Inc.*, 151 F.3d 938 (9th Cir. 1998), indicated that the "test [for materiality] is the *intrinsic* capabilities of the statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances." *Id.* at 941 (emphasis in original) (internal quotation marks omitted).

Similarly, in *United States v. Edgar*, 82 F.3d 499 (1st Cir. 1996), the First Circuit applied an objective materiality test in a case with important factual similarities to the instant appeal:

A statement is material if it has a natural tendency

18

to influence or is capable of influencing a government function. . . . Edgar argues that because *the decision not to grant him [federal workers' compensation] benefits had already been made and because his forms were filed late*, his failure to set forth his self-employment was not material. However, the standard is not whether there was actual influence, but whether [the statement or omission] would have a tendency to influence. The district director of the OWCP testified that on a claim for disability, whether one may work or has worked has considerable influence on the amount of benefits warranted. Thus, the district court did not err in finding Edgar's false statements to be material.

*Id.* at 510 (emphasis added).

We conclude that McBane's false denial of moving or selling the guns involved statements that would normally be capable of influencing a criminal investigation. McBane not only denied stealing or selling the guns himself, but said that the guns had never been out of police custody, i.e., that *no one* had ever stolen or sold them. He also volunteered to show the guns to the agents, which he subsequently did. Such misrepresentations, under normal circumstances, could cause FBI agents to re-direct their investigation to another suspect, question their informant differently or more fully, or perhaps close the investigation altogether. In fact, as the Government

19

argues, McBane's own testimony indicated that he hoped and expected that his false statements would have precisely those effects. McBane testified that he lied to the Agents so that the investigation would turn "to other people, whether within my department or elsewhere. . . . They would leave me alone."

We hold that substantial evidence supports the jury's finding that McBane's false statements to the FBI were material.

## III.

Finally, we must decide whether McBane's case should be remanded for resentencing pursuant to the Supreme Court's decision in *United States v. Booker*. We conclude that McBane's case should be remanded.[13]

In *United States v. Davis*, 407 F.3d 162, 165 (3d Cir. 2005), we announced our intention to remand for resentencing

---

[13]McBane originally raised, and the parties briefed, the issue of McBane's entitlement to a sentencing reduction under the Guidelines for acceptance of responsibility. We subsequently ordered the parties to address whether remand for resentencing under *Booker* was appropriate. Because we will remand the case for post-*Booker* resentencing, we need not evaluate the District Court's finding that an "acceptance of responsibility" sentence reduction was not warranted.

those cases in which sentence was imposed under the pre-*Booker* mandatory guidelines regime, was enhanced pursuant to judge-found facts (other than the existence of prior convictions), and was challenged on direct appeal:

> Furthermore, as noted by the Court of Appeals for the Sixth Circuit, "[w]e would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [defendant] the same sentence post-*Booker*." Failure to remand for resentencing, therefore, could adversely affect the fairness and integrity of the proceedings. Accordingly, defendants sentenced under the previously mandatory regime whose sentences are being challenged on direct appeal may be able to demonstrate plain error and prejudice. We will remand such cases for resentencing.

*Id.* at 165. As the above language from *Davis* suggests, in order to qualify for resentencing under *Booker*, a defendant must object to his sentence at sentencing and reassert his argument on direct appeal. *See U.S. v. Ordaz*, 398 F.3d 236, 239 (3d Cir. 2005).

McBane preserved the issue of sentencing at both the trial and sentencing stages, raised a challenge to his sentence on

21

appeal, and raised the *Booker* issue before us by proper supplemental letter-motion to the Court. The Government made no response by supplemental letter or brief on the issue of a remand under *Booker*. The District Court concluded that McBane's offense level under the Guidelines should include enhancements of two points for his role in the offense and two points if the rifle was stolen. McBane asserts that because the former enhancement "was not charged as part of the indictment," i.e., the factual predicate for the enhancement was found by the Court, not by the jury, it is subject to *Booker* scrutiny and requires remand pursuant to our decision in *Davis* regarding post-*Booker* cases. We agree.

IV.

For the foregoing reasons, we will affirm the judgment of conviction on both the stolen gun sale and false statement charges under 18 U.S.C. §§ 922(j) and 1001, respectively. We will vacate McBane's sentence, and we will remand the case for resentencing.