**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 20, 2012

No. 11-50166

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

SENAN KAHTAN ABRAHEM

Defendant-Appellant

Appeals from the United States District Court
for the Western District of Texas

Before JOLLY, DAVIS, and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant-Appellant Senan Kahtan Abrahem was convicted of knowingly making a material false statement to Department of Defense security personnel in violation of 18 U.S.C. § 1001(a)(2). He appeals on the ground that the evidence was insufficient to establish his false statement was material. For the following reasons, we AFFIRM Abrahem's conviction.

**I**.

On the morning of January 6, 2010, the Defendant entered the Brooke Army Medical Center (BAMC) demanding to see a patient in the hospital accused in the Fort Hood shooting. He claimed he was the patient's lawyer. Though he did not identify the patient by name, he was referring to Major Nidal

No. 11-50166

Hasan, an army psychologist who was being held as a protected patient at BAMC after shooting several people at Fort Hood several months before. The front desk volunteers understood that the Defendant was referring to Major Hasan. They informed the Defendant that they did not have the authority to permit him to see Major Hasan, and they notified security. The Defendant became increasingly agitated; he began shouting and banging on the information desk and made various remarks referring to the man he was seeking to see as "my brother," and suggesting that the volunteers "shoot me."

Staff Sergeant Justin White was in the BAMC lobby and heard the commotion. He walked up to the Defendant and moved him away from the information desk. Sergeant White testified that Defendant told him that he was there to see "the psychiatrist," "the one who was shot by the infidels." He testified that the Defendant was yelling various statements, including "Allah Akbar," and that the man he was trying to see was innocent.

Captain Bielling, the supervisor of uniformed security at BAMC, testified that he responded to the duress alarm from the information desk. Captain Bielling identified himself and asked to see the Defendant's identification, which he provided. Captain Bielling testified that he asked the Defendant what he was doing there, and the Defendant replied that he was there to see the person involved with the shooting at Ford Hood. The Defendant was informed that he was not allowed access to the shooter, and that only lawyers and physicians were able to see him. The Defendant replied that he was the man's lawyer, and he asked if he could see him.[1] Captain Bielling asked the Defendant what his client's name was. The Defendant replied he didn't remember. The Defendant asked several bystanders the name of the person who was involved in the Ford Hood shooting. Somebody said it was Major Hasan, and the Defendant said

---

[1] This false statement is the basis for the charge.

No. 11-50166

that's the person he wanted to see. According to Captain Bielling, the Defendant identified himself as a Muslim, said he was the person's Muslim brother, and that he had the right to defend him. In making these statements, the Defendant was cooperative and no longer excited, loud or violent. Captain Bielling informed the Defendant that Major Hasan already had a legal team, and that the Defendant would have to coordinate with them if he wanted to defend Major Hasan.

The Defendant then identified himself as a doctor for Major Hasan and stated he was there to treat him. Captain Bielling asked him what he was there to treat him for and the Defendant responded it was confidential. Captain Bielling told the Defendant that Major Hasan already had a doctor and medical team and if he wanted to treat Major Hasan he would have to coordinate with that team.

The Defendant stated that if he was not allowed to see Major Hasan that day he would come back every day for 15 minutes and cause a disturbance until he was let in. Captain Bielling informed him that he had caused a disturbance already, that he had to leave, and that he was interfering with patient care. The Defendant put his wrists in the air and asked if Captain Bielling was going to put handcuffs on him or arrest him. Captain Bielling said he was not, that he was just going to take down the Defendant's information and that the Defendant had to leave. The Defendant stated he wanted to sit and collect himself for ten minutes. Captain Bielling told him he could wait in his car and that he had to leave. The Defendant agreed to leave, stood up, and walked out. Captain Bielling and two other officers accompanied the Defendant out of the lobby. The officers took down the relevant material describing the Defendant's car and gave it to the information desk. The Defendant got into his vehicle and departed.

The Defendant admits he is not and never has been a lawyer.

3

No. 11-50166

All of the witnesses testified that protocols existed that forbade walk-in visitors from seeing Major Hasan. None of the witnesses believed the Defendant's claim that he was Major Hasan's lawyer. Captain Bielling testified that even if he had believed the Defendant he still would not have allowed him to see Major Hasan, but would have referred the Defendant to Major Hasan's defense team. After the Defendant left BAMC, Captain Bielling followed the set protocol of advising CID, the Army's Criminal Investigation Command, of the incident and filling out an incident report for them.

## II.

Abrahem was charged with a violation of 18 U.S.C. § 1001(a), (a)(2). The indictment alleged the Defendant's conduct as follows:

> [I]n order to gain access to a restricted patient and military prisoner, the Defendant falsely stated to Department of Defense security personnel at Brooke Army Medical Center ("BAMC") that he was the lawyer for the individual who shot 13 people at Ford Hood . . . referring to N.M.H. [the Ford Hood Shooter], who is a patient and military prisoner being held at BAMC, while the Defendant knew he was neither a lawyer nor representing N.M.H.

The Defendant was convicted after a two day jury trial. At the close of the Government's evidence, the Defendant moved for a judgment of acquittal, arguing that the Government had failed to prove that the Defendant's statement was material. The court denied the motion and also denied the Defendant's renewed motion at the close of the evidence.

The Defendant was sentenced to a five-year term of probation and ordered to pay a $100 special assessment.

The Defendant timely appealed his conviction.

## III.

On appeal, the Defendant challenges the sufficiency of the evidence to prove that his statement was "material." We review a denial of a motion for

4

judgment of acquittal de novo.  Fed. R. Crim. Pro. 29; *United States v. Delgado*, 256 F.3d 264, 273 (5th Cir. 2001).  "The jury's verdict will be affirmed if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt.  In assessing the sufficiency of the evidence, we do not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict." *Delgado*, at 273-74 (internal citations omitted).

## IV.

## A.

A violation of 18 U.S.C. § 1001 requires proof of five elements: "(1) a statement, that is (2) false, (3) and material, (4) made with the requisite specific intent, [and] (5) within the purview of government agency jurisdiction." *United States v. Najera Jimenez*, 593 F.3d 391, 399 (5th Cir. 2010) (internal citations omitted).

The Defendant challenges only whether the Government proved that the Defendant's false statement was "material."  The parties agree that the first step in the analysis is to ask two "questions of purely historical fact" (1) what statement was made, and (2) what decision the agency was trying to make. *Id.* (citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).  The third question is whether, under the appropriate legal standard, the statement was material to the decision the agency is trying to make.  To meet the standard of materiality under § 1001, "[t]he statement must have a natural tendency to influence or be capable of influencing the decision of the decisionmaking body to which it was addressed." *Id.* (internal citations omitted).  Actual influence is not required – a statement can be ignored or never read and still be material – and the statement need not be believed. *Id.*

No. 11-50166

The parties likewise agree that the false statement at issue is the Defendant's statement to Captain Bielling that he was Major Hasan's lawyer. The Defendant argues that this statement fails to meet the materiality standard for two separate reasons, which we consider below.

## B.

First, the Defendant argues that the decision the agency was trying to make was whether the Defendant would be allowed access to Hasan. He argues that his statement that he was Major Hasan's lawyer was incapable of influencing this decision because "regardless of what Abrahem said or who he claimed to be he would not have been allowed access to Hasan under the Army protocol in place at the time of his statement."

The Defendant bases this argument on Captain Bielling's testimony that under the protocol in place, no person was allowed access to Hasan unless they had prior clearance from CID. Captain Bielling also testified that even if he had believed the Defendant – or even if the Defendant had been R. Clark Adams, already known to BAMC security as Hasan's actual lawyer – he would not have been admitted to see Hasan without clearance from CID. Bielling stated that "[i]t didn't matter what [the Defendant] said," the security team was not going to allow the Defendant access to Hasan. Accordingly, the Defendant argues, his false statement could not have been material to that decision.

We agree that the ultimate decision the agency was called upon to make was whether the Defendant could have access to Hasan. However, the jury reasonably could have concluded that the decision being made by Captain Bielling was not whether to allow the Defendant access to Hasan at that instant, but whether the Defendant could see Hasan after being cleared, and thus whether to advance him to the next step in the process by investigating his claims further and/or referring him to CID for clearance. See *Najera Jimenez*, 593 F.3d at 400.

6

No. 11-50166

In addition, the Defendant's argument assumes the agency always perfectly follows its protocol. Because the Defendant apparently did not come across as believable, the agency had no trouble turning him away, and the officer in charge asserts he would have done the same even if the Defendant had been believable. This may be true but we disagree that this ends the inquiry. Confidence men often succeed in persuading the gate keeper to allow them to enter. Agency protocol is not always followed and those familiar with protocol are not always on duty. The test is whether the statement tests these protocols, or has the natural tendency to influence or be capable of influencing the decision maker, not whether it actually influenced the decision on this one occasion. *United States v. McIntosh*, 655 F.2d 80, 83 (5th Cir. 1981). The Defendant's statement that he was Hasan's lawyer tests those functions requiring a decision by the agency to prevent the Defendant from achieving his objective in a way that an immaterial statement does not.

In *Kungys v. United States*, 485 U.S. 759 (1988), the United States sought to revoke Kungys' citizenship under 8 U.S.C. § 1451(a) after it was discovered that during the naturalization proceedings he had misrepresented certain material facts relating to his date and place of birth, wartime occupations, and wartime residence. The question narrowed to whether the misrepresentations were material under the relevant statutes.

Justice Scalia, writing for the court, made the following points:

(1) The same materiality standard applied in this case as applies for a violation of § 1001.

(2) The question was whether the statements had "a natural tendency to influence, or [were] capable of influencing, the decision of the decisionmaking body to which [they were] addressed." *Id.*, at 770 (quoted in *Gaudin*, 515 U.S. at 510). In interpreting that phrase, Justice Scalia stated that rather than letting the "infinite variety of factual patterns that may emerge" around a

7

statement drive the materiality question, the "safer" method is "to fix as our guide the central object of the inquiry: whether the misrepresentation or concealment was predictably capable of affecting, i.e., had a natural tendency to affect, the official decision." *Id.*, at 771.[2]

In *U.S. v. McBane*, 433 F.3d 344 (3rd Cir. 2005), the question was whether a statement the defendant made to an FBI agent, which the agent knew to be false, was material to the agent's investigation. The court gave its interpretation of the above language from *Kungys:* "In other words, the [*Kungys*] Court judged the relevant inquiry to be whether the falsehood was of a type that one would normally predict would influence the given decision making body." The court reasoned that:

> The dispositive question on this issue is whether the test for 'materiality' necessarily requires that a false statement be capable of influencing an *actual, particular* decision of the agency at issue, or whether the test requires only that a statement be of a type that would naturally tend to influence a *reasonable* decisionmaking agency in the abstract.

*Id.* at 350. The court answered the question by referring to Justice Scalia's opinion in *Kungys,* which it read as making it clear that the "natural tendency" test is an objective one focused on whether the statement is "of a type capable of influencing a *reasonable* decision maker." *Id.*, at 351 (emphasis in original). The court observed that, as it understood it, "the phrase 'natural tendency' connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself." *Id.* It indicated that it was joining the First and Ninth circuits in "apply[ing] an objective materiality test," focused on "'the intrinsic capabilities of the statement itself, rather than the possibility of the actual attainment of its end as measured

---

[2] The Court concluded that the misrepresentations were not material because the subject matter of the statements was not relevant to Kungys' eligibility for citizenship.

by collateral circumstances.'" *Id.*, at 352 (quoting *United States v. Service Deli, Inc.*, 151 F.3d 938, 941 (9th Cir.1998)) (citing *United States v. Edgar*, 82 F.3d 499 (1st Cir.1996)).

Finally, the Defendant's argument in this case is similar to that rejected by this court in *Najera Jimenez*, 593 F.3d at 399-400. There, the defendant was convicted under § 1001(a)(2) for lying to a State Department agent who was investigating her application for a United States passport. She told the agent she had never heard from the State Department regarding a previous passport application. This was false, because after corresponding with her, the State Department had denied her previous application resulting in a fraud alert being placed on her profile. The defendant argued that her omission of this information in her new application was not material. She claimed that the State Department already knew of the denial, and she would have been denied a passport under the State Department protocol in place anyway. Accordingly, she argued, her omission was incapable of influencing the State Department's decision whether she was eligible for a passport. The court accepted the defendant's factual premise but it rejected her argument that this made her misrepresentations immaterial. It found that her omission could have led the State Department to make its decision based on incorrect information and this was sufficient to satisfy the materiality element. The court reasoned that this element requires only that the misrepresentation be capable of influencing the agency's decision. It thus requires only a showing that "the functioning of the agency involved would have been impaired had the agency relied on the defendant's statement," because the misrepresentation would have caused the agency to make its decision based on false or incorrect information, and that "[i]t is enough that the potential for subversion of an agency's function can readily be inferred." *Id.* (internal quotations omitted).

No. 11-50166

Based on the above authorities and analysis, we are persuaded that a statement to a decision maker in a military hospital that the speaker is the lawyer for a restricted military prisoner is the type of statement capable of influencing the decision maker to allow the speaker to visit the patient and that the protocols in place did not affect the statement's materiality.

**C.**

The Defendant also argues that the statement was incapable of influencing this or any other agency decision because it "was obviously delusional," based on the Defendant's agitated demeanor and the semi-coherent statements he was making. The Defendant argues that "[t]his was not just a situation in which the government agent knew the statement was false," but one where the statement – objectively viewed "in the context of all the [the Defendant's] other statements and actions" – "was obviously delusional" and thus incapable of influencing a decision.

We disagree. First, there is nothing irrational or delusional about the reason the Defendant gave to gain admittance to see Hasan, that he was Hasan's lawyer. The fact that his presentation was not persuasive or believable does not make the statement immaterial.

At bottom, this argument is an assertion that under the facts of this case, the manner in which the false statement was delivered – rather than the substance of the statement – renders it immaterial. We agree with the court in *McBane* that the focus should be on whether the statement is of a type that would naturally tend to influence or is capable of influencing the decision maker. The Supreme Court's use of the phrase "natural tendency to influence," *Gaudin*, 515 U.S. at 512, points to intrinsic qualities of the statement in question that "transcend the immediate circumstances in which it is offered and inhere in the statement itself." *McBane*, 433 F.3d at 351. We therefore conclude that

10

No. 11-50166

Abrahem's delivery of the statement in a manner not likely to persuade does not affect the materiality of the statement.

## V.

For the foregoing reasons, we affirm the Defendant's conviction.

AFFIRMED

No. 11-50166

E. GRADY JOLLY, Circuit Judge, dissenting:

In order to affirm Senan Kahtan Abrahem's conviction for knowingly making a materially false, fictitious, or fraudulent statement in violation of 18 U.S.C. § 1001(a), (a)(2), the majority, putting aside a common sense application of the relevant principles, distorts *Kungys* and its progeny and reaches what I respectfully consider an irrational result on the question of materiality: A psychotic man, acting in a psychotic manner, makes a statement that admittedly no one takes seriously or believes is true, and upon which no government official or anyone else acts or has a tendency to act, and the majority calls the bizarre statement uttered by a mentally ill individual a lie that is material to some unidentifiable government decision and consequently, a federal felony subject to five years in prison. I respectfully dissent.

The Supreme Court set forth the appropriate framework for testing the materiality of false statements in *United States v. Gaudin*, 515 U.S. 506 (1995):

> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to make?" The ultimate question: (c) "whether the statement was material to the decision" requires applying the legal standard of materiality . . . to these historical facts.

*Id.* at 512. A material statement must have "'a natural tendency to influence, or [be] capable of influencing, the *decision of the decisionmaking body* to which it was addressed.'" *Id.* at 509 (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)) (emphasis added and alteration in original).

As the majority notes, the false statement with which Abrahem was charged was his statement to Captain Bielling that he was Major Hasan's lawyer. Maj. Op. at 2. Under *Gaudin* and the test for materiality, the relevant agency decision also must be identified. Abrahem contends that the relevant decision the agency was called upon to make was whether Abrahem would be

12

allowed access to Major Hasan; the testimony was undisputed that no one was allowed access to Major Hasan through a mere request of Captain Bielling; Abrahem's false statement that he was a lawyer made only to Captain Bielling therefore had no possibility of influencing a decision permitting access to Major Hasan.

Straining to rebut this argument, the majority determines "that the *ultimate* decision the agency was called upon to make was whether the Defendant could have access to Hasan." *Id.* at 6 (emphasis added). "However," it continues, "the jury reasonably could have concluded that the decision being made by Captain Bielling[1] was not whether to allow the Defendant access to Hasan at that instant, but whether the Defendant could see Hasan after being cleared, and thus whether to advance him to the next step in the process by investigating his claims further and/or referring him to CID for clearance." *Id.* at 6-7. Although, by the time it concludes its analysis of the statement's materiality, the majority appears to have abandoned the two "sub-decisions," writing: "Based on the above authorities and analysis, we are persuaded that a statement to a decision maker in a military hospital that the speaker is the lawyer for a restricted military prisoner is the type of statement capable of influencing the decision maker to allow the speaker to visit the patient and that the protocols in place did not affect the statement's materiality." *Id.* at 10.

The majority has, by my count, attempted to identify by "what if" reasoning three different decision makers and three different decisions. Among the "decisions" are: (1) the "ultimate decision" whether to allow Abrahem to have access to Major Hasan; (2) whether to allow Abrahem to see Major Hasan

---

[1] This speculation of the majority concerning "the decision being made" by Captain Bielling disregards the testimony the jury actually heard: that Bielling specifically said that he could not make and did not make a decision, and even if he had, he was not, and could not have been, influenced by the statement.

after being cleared; and (3) whether to advance Abrahem to the next step in the process by referring him to CID. Then there are the speculative "decision makers": (1) is it the Department of Defense–i.e., Captain Bielling–as indicated in the indictment;[2] (2) is it the Army CID, who had final authority to admit or deny visitors access to see Major Hasan; or (3) is it Major Hasan's legal team, although that is problematic because there is no indication in the record that his legal team was part of a federal agency. By the end of its analysis, the majority appears to have settled on the decision being that of Captain Bielling, albeit in a "reasonable decision maker" role, whether to allow Abrahem access to Major Hasan. Captain Bielling, however, testified that he could not make a decision responsive to Abrahem's request because the protocols in place precluded him from making that decision. He stated under oath that Abrahem's statement did not and could not have influenced him to make a decision that was responsive. Thus, one may kindly ask how Captain Bielling could be the "decision maker," when he could make no decision. In its determination to uphold this conviction, the majority breaks down "the agency's" decision into sub-parts, admitting that the "ultimate decision" was one that was never presented to the "agency" and thus implicitly acknowledging that the statement did not influence the ultimate decision maker.

What was the decision here? Guidance from the Supreme Court and our cases can be interpreted in only one way–that the agency's decision was only what the majority christens as the "ultimate decision." Abrahem's false statement, if it is to be a federal crime, must have been capable of influencing that "ultimate" decision. But, here, the agency was never called upon to make

---

[2] The indictment charged Abrahem with "falsely stat[ing] to Department of Defense security personnel at Brooke Army Medical Center ("BAMC") that he was the lawyer" for the Fort Hood Shooter.

No. 11-50166

a decision. Accordingly, Abrahem's statement can not be capable of influencing a decision never made.

In order to uphold this conviction, the majority casts aside the record and the beyond-a-reasonable-doubt standard to make the bold assumptions that "[c]onfidence men often succeed in persuading the gate keeper to allow them to enter," and that "[a]gency protocol is not always followed and those familiar with protocol are not always on duty." *Id.* at 7. It then appears to derive a new test for materiality determined by "whether the statement tests these protocols," while announcing, in the same sentence, that the statement must only have a "natural tendency to influence or be capable of influencing the decision maker, [and] not whether it actually influenced the decision on this one occasion." *Id.* It then states that Abrahem's "statement that he was Hasan's lawyer *tests those functions* requiring a decision by the agency to prevent the Defendant from achieving his objective in a way that an immaterial statement does not." *Id.* (emphasis added). This appears to be a completely new test.

But the majority instead of trying to find its way out of the tall grass, wanders further in. It transitions to a discussion of *United States v. McBane*, 433 F.3d 344 (3d Cir. 2005), and its stray interpretation of *Kungys.* Although in *Kungys* Justice Scalia gave clear guidance, saying that the inquiry is "whether the misrepresentation or concealment was predictably capable of affecting, *i.e.,* had a natural tendency to affect, *the official decision*" *Kungys*, 485 U.S. at 771 (emphasis added), the *McBane* court—and now the majority—has confused this to mean that the relevant inquiry is "'whether the falsehood *was of a type* that *one* would normally predict would influence the *given decision making body*,'" Maj. Op. at 8 (quoting *McBane*, 433 F.3d at 351) (emphasis added). I can not read *Kungys* as supporting the proposition that the Supreme Court indicated that a false statement could be material if it was merely a type of statement that was capable of influencing a reasonable decision maker. Without regard to whether

15

the false statement was capable of influencing the official decision of the agency, the materiality standard becomes a tool by which courts can eschew any semblance of context surrounding the false statement and simply ask, in the abstract, whether a statement was of a type capable of influencing a reasonable decision maker.  The materiality standard adopted by the Supreme Court in *Kungys*–one that had been used for decades in the lower courts and quoted approvingly by the Supreme Court years later in *Gaudin*–should not be applied to exclude all context in every situation and at all times; often, a given statement can only be explained or defined by context.  The statement "I am a lawyer" from someone banging around in delusion, asking for someone whose name he does not remember, has a different objective meaning to the official decision maker than the same statement made by a man in a pinstripe suit with a briefcase, conducting himself rationally, who asks to see his client by a specific name.  Surely, the majority would not contend that the statement, "I am the lawyer for the Fort Hood shooter," made by a six-year-old in cut-off jeans would be one that is material simply because "I am a lawyer" is the *type of statement* capable of influencing the official decision whether to allow the speaker to visit the client.  Similarly, a man whom everyone that morning knew to be acting in a delusional and psychotic state could no more influence the decision maker than that six-year-old boy.  I fear, however, that the majority's unwarranted extension of *Kungys* will lead to other absurd results.  The materiality standard sanctioned by the Supreme Court in *Gaudin* cannot support the proposition that Abrahem made a materially false statement.  By holding otherwise, the majority has taken leave of a common sense application of the law.

I, therefore, respectfully dissent.