*377 E. GRADY JOLLY, Circuit Judge,
dissenting:
In order to affirm Senan Kahtan Abrahem’s conviction for knowingly making a materially false, fictitious, or fraudulent statement in violation of 18 U.S.C. § 1001(a), (a)(2), the majority, putting aside a common sense application of the relevant principles, distorts Kungys and its progeny and reaches what I respectfully consider an irrational result on the question of materiality: A psychotic man, acting in a psychotic manner, makes a statement that admittedly no one takes seriously or believes is true, and upon which no government official or anyone else acts or has a tendency to act, and the majority calls the bizarre statement uttered by a mentally ill individual a lie that is material to some unidentifiable government decision and consequently, a federal felony subject to five years in prison. I respectfully dissent.
The Supreme Court set forth the appropriate framework for testing the materiality of false statements in United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995):
Deciding whether a statement is “material” requires the determination of at least two subsidiary questions of purely historical fact: (a) “what statement was made?” and (b) “what decision was the agency trying to make?” The ultimate question: (c) “whether the statement was material to the decision” requires applying the legal standard of materiality ... to these historical facts.
Id. at 512, 115 S.Ct. 2310. A material statement must have “ ‘a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.’ ” Id. at 509, 115 S.Ct. 2310 (quoting Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)) (emphasis added and alteration in original).
As the majority notes, the false statement with which Abrahem was charged was his statement to Captain Bielling that he was Major Hasan’s lawyer. Maj. Op. at 371-72. Under Gaudin and the test for materiality, the relevant agency decision also must be identified. Abrahem contends that the relevant decision the agency was called upon to make was whether Abrahem would be allowed access to Major Hasan; the testimony was undisputed that no one was allowed access to Major Hasan through a mere request of Captain Bielling; Abrahem’s false statement that he was a lawyer made only to Captain Bielling therefore had no possibility of influencing a decision permitting access to Major Hasan.
Straining to rebut this argument, the majority determines “that the ultimate decision the agency was called upon to make was whether the Defendant could have access to Hasan.” Id. at 374 (emphasis added). “However,” it continues, “the jury reasonably could have concluded that the decision being made by Captain Bielling[1] was not whether to allow the Defendant access to Hasan at that instant, but whether the Defendant could see Hasan after being cleared, and thus whether to advance him to the next step in the process by investigating his claims further and/or referring him to CID for clearance.” Id. at 374. Although, by the time it concludes its analysis of the statement’s materiality, the majority appears to have abandoned the two “sub-decisions,” writing: “Based *378 on the above authorities and analysis, we are persuaded that a statement to a decision maker in a military hospital that the speaker is the lawyer for a restricted military prisoner is the type of statement capable of influencing the decision maker to allow the speaker to visit the patient and that the protocols in place did not affect the statement’s materiality.” Id. at 376.
The majority has, by my count, attempted to identify by “what if’ reasoning three different decision makers and three different decisions. Among the “decisions” are: (1) the “ultimate decision” whether to allow Abrahem to have access to Major Hasan; (2) whether to allow Abrahem to see Major Hasan after being cleared; and (3) whether to advance Abrahem to the next step in the process by referring him to CID. Then there are the speculative “decision makers”: (1) is it the Department of Defense — i.e., Captain Bielling — as indicated in the indictment;[2] (2) is it the Army CID, who had final authority to admit or deny visitors access to see Major Hasan; or (3) is it Major Hasan’s legal team, although that is problematic because there is no indication in the record that his legal team was part of a federal agency. By the end of its analysis, the majority appears to have settled on the decision being that of Captain Bielling, albeit in a “reasonable decision maker” role, whether to allow Abrahem access to Major Hasan. Captain Bielling, however, testified that he could not make a decision responsive to Abrahem’s request because the protocols in place precluded him from making that decision. He stated under oath that Abrahem’s statement did not and could not have influenced him to make a decision that was responsive. Thus, one may kindly ask how Captain Bielling could be the “decision maker,” when he could make no decision. In its determination to uphold this conviction, the majority breaks down “the agency’s” decision into sub-parts, admitting that the “ultimate decision” was one that was never presented to the “agency” and thus implicitly acknowledging that the statement did not influence the ultimate decision maker.
What was the decision here? Guidance from the Supreme Court and our cases can be interpreted in only one way — that the agency’s decision was only what the majority christens as the “ultimate decision.” Abrahem’s false statement, if it is to be a federal crime, must have been capable of influencing that “ultimate” decision. But, here, the agency was never called upon to make a decision. Accordingly, Abrahem’s statement can not be capable of influencing a decision never made.
In order to uphold this conviction, the majority casts aside the record and the beyond-a-reasonable-doubt standard to make the bold assumptions that “[cjonfidence men often succeed in persuading the gate keeper to allow them to enter,” and that “[ajgency protocol is not always followed and those familiar with protocol are not always on duty.” Id. at 374. It then appears to derive a new test for materiality determined by “whether the statement tests these protocols,” while announcing, in the same sentence, that the statement must only have a “natural tendency to influence or be capable of influencing the decision maker, [and] not whether it actually influenced the decision on this one occasion.” Id. It then states that Abrahem’s “statement that he was Hasan’s lawyer tests those functions requiring a decision by the agency to pre *379 vent the Defendant from achieving his objective in a way that an immaterial statement does not.” Id. (emphasis added). This appears to be a completely new test.
But the majority instead of trying to find its way out of the tall grass, wanders further in. It transitions to a discussion of United States v. McBane, 433 F.3d 344 (3d Cir.2005), and its stray interpretation of Kungys. Although in Kungys Justice Scalia gave clear guidance, saying that the inquiry is “whether the misrepresentation or concealment was predictably capable of affecting, i.e., had a natural tendency to affect, the official decision” Kungys, 485 U.S. at 771, 108 S.Ct. 1537 (emphasis added), the McBane court — and now the majority — has confused this to mean that the relevant inquiry is “ ‘whether the falsehood was of a type that one would normally predict would influence the given decision making body,’ ” Maj. Op. at 375 (quoting McBane, 433 F.3d at 351) (emphasis added). I can not read Kungys as supporting the proposition that the Supreme Court indicated that a false statement could be material if it was merely a type of statement that was capable of influencing a reasonable decision maker. Without regard to whether the false statement was capable of influencing the official decision of the agency, the materiality standard becomes a tool by which courts can eschew any semblance of context surrounding the false statement and simply ask, in the abstract, whether a statement was of a type capable of influencing a reasonable decision maker. The materiality standard adopted by the Supreme Court in Kungys — one that had been used for decades in the lower courts and quoted approvingly by the Supreme Court years later in Gaudin — should not be applied to exclude all context in every situation and at all times; often, a given statement can only be explained or defined by context. The statement “I am a lawyer” from someone banging around in delusion, asking for someone whose name he does not remember, has a different objective meaning to the official decision maker than the same statement made by a man in a pinstripe suit with a briefcase, conducting himself rationally, who asks to see his client by a specific name. Surely, the majority would not contend that the statement, “I am the lawyer for the Fort Hood shooter,” made by a six-year-old in cut-off jeans would be one that is material simply because “I am a lawyer” is the type of statement capable of influencing the official decision whether to allow the speaker to visit the client. Similarly, a man whom everyone that morning knew to be acting in a delusional and psychotic state could no more influence the decision maker than that six-year-old boy. I fear, however, that the majority’s unwarranted extension of Kungys will lead to other absurd results. The materiality standard sanctioned by the Supreme Court in Gaudin cannot support the proposition that Abrahem made a materially false statement. By holding otherwise, the majority has taken leave of a common sense application of the law.
I, therefore, respectfully dissent.

. This speculation of the majority concerning “the decision being made” by Captain Bielling disregards the testimony the jury actually heard: that Bielling specifically said that he could not make and did not make a decision, and even if he had, he was not, and could not have been, influenced by the statement.

. The indictment charged Abrahem with "falsely stat[ing] to Department of Defense security personnel at Brooke Army Medical Center ("BAMC”) that he was the lawyer” for the Fort Hood Shooter.